Addie R. Whitcomb v. Commissioner. Beulah Whitcomb Summers v. Commissioner.
Whitcomb v. Commissioner
Docket Nos. 17925, 17973.
United States Tax Court
1949 Tax Ct. Memo LEXIS 56; 8 T.C.M. (CCH) 907; T.C.M. (RIA) 49249; October 6, 1949
*56 Dorothy Ann Kinney, Esq., Amarillo Bldg., Amarillo, Tex., for the petitioners. John W. Alexander, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These proceedings, consolidated for hearing, involve deficiencies in income taxes for 1944, $7,098.75 in Docket No. 17925 and $108.51 in Docket No. 17973. The issue in each proceeding is whether respondent erred in disallowing as a deduction in the taxable year an ordinary loss sustained on the sale of real property. Findings of Fact The petitioners are sisters, Addie R. Whitcomb, hereinafter for convenience sometimes referred to as the petitioner, being a resident of Amarillo, Texas, and Beulah Whitcomb Summers, a resident of Dallas, Texas. They filed their returns with the collector for the second district of Texas. The petitioner owned all of Lot 7, Block 59, Glidden and Sanborn Addition to the city of Amarillo, Texas, and an undivided onefourth interest in Lot 6, the adjoining lot. The petitioner, Beulah Whitcomb Summers and her two brothers, Guy P. Whitcomb, a resident of Amarillo, Texas, and Harry K. Whitcomb, a resident of Bentonville, Arkansas, each owned an undivided *57 one-fourth interest in lot No. 6. A few days prior to November 29, 1943, T. M. Bruner, a real estate agent, informed petitioner that Harvey Southworth was interested in purchasing the lots for $25,000. Thereupon, petitioner communicated with her sister and brothers and received their verbal permission to sell the property. She so advised Bruner, who, on November 29, 1943, prepared and delivered to petitioner a sales contract for the property. The sales contract recites that petitioner and Guy P. Whitcomb, called the seller, "acting through the undersigned and duly authorized Agent, hereby sells and agrees to convey unto Harvey Southworth hereinafter called Purchaser," all of lots Nos. 6 and 7, for the purchase price of $25,000, payable $5,000 cash, the receipt of which was acknowledged by the "Agent," the remainder to be evidenced by a vendor's lien note, secured by a vendor's lien and deed of trust, payable $2,500 annually, including interest at the rate of 5 per centum per annum, commencing one year after the date of the deed. Other provisions of the instrument read as follows: "Seller agrees to furnish abstract or title policy to said property, which shall be conveyed free *58 and clear of any and all encumbrances except those named herein. "Purchaser agrees, within ten days from receipt of said abstract, either to accept the title as shown by said abstract or to return it to the undersigned Agent, with the written objections to the title. If said abstract is not returned to the Agent with the written objections noted within the time specified, it shall be construed as an acceptance of said title. "If any objections are made, then the Seller or the Agent shall have a reasonable time to cure said objections and show good and marketable title. In the event of failure to furnish good and marketable title, the purchase money hereby receipted for is to be returned to Purchaser upon the cancellation and return of this contract; or, Purchaser may enforce specific performance of same. "Seller agrees, when title objections have been cured, to deliver a good and sufficient General Warranty Deed properly conveying to said Purchaser, and Purchaser agrees when said deed is presented, to pay the balance of the cash payment and execute the note herein provided for. Seller further agrees to pay Agent the usual commission as per schedule of the Amarillo Real Estate *59 Board. Should the Purchaser fail to consumate [consummate] this contract as specified for any reason except title defects, Seller shall have the right to retain said cash deposit as liquidated damages for the breach of this contract, and shall pay to Agent therefrom the usual commission, as per schedule of the Amarillo Real Estate Board; or, Seller may enforce specific performance of this contract. "Taxes for the current year, and current rents, insurance, and interest (if any), are to be prorated to date of closing." The instrument was signed by the petitioner and Guy P. Whitcomb, as "Seller," by Harvey Southworth, as "Purchaser" and T. M. Bruner as "Agent" The petitioner did not discuss the contract of sale with Beulah W. Summers or Harry K. Whitcomb and they did not authorize her to sign an instrument for them. The cash payment of $5,000 was made on November 29, 1943, by a check of the purchaser payable to T. M. Bruner. The check was entered in the books of Southworth as payment on a lot purchased on November 29, 1943, for $25,000. The check was paid on December 1, 1943, by the bank on which it was drawn. An abstract of title to the lots was delivered to counsel for the *60 purchaser on about December 1, 1943, for approval. Counsel examined the abstract and on December 11, 1943, informed the purchaser by letter of his objections to the title, including question whether the sellers had title, probate proceedings of the estate of Mary C. Whitcomb, deceased, mother of petitioners, payment of inheritance taxes on the estate of Hugh F. Whitcomb, deceased, a brother of petitioners, and errors made by the abstractor. The first act to cure the alleged defects in the title was taken on December 18, 1943. On that date steps were also taken to ascertain whether the inheritance taxes had been paid, an objection not settled for the record until January 4, 1944.at some undisclosed time after December 18, 1943, the abstractor obtained the abstract of title for consideration of the errors therein as found by counsel for the purchaser. The abstractor did not certify the completion of his examination until January 4, 1944. The tax certificate showing payment of taxes on the lots to and including the year 1943 was issued on January 3, 1944. Counsel for the purchaser approved the title on January 4, 1944. The warranty deed of the sellers, the vendor's lien note and the *61 deed of trust bear the date of December 20, 1943, the day on which they were dictated by counsel for the purchaser. The warranty deed was acknowledged by petitioner and Guy P. Whitcomb on December 20, 1943, by Beulah W. Summers on December 27, 1943, and by Harry K. Whitcomb and his wife on December 30, 1943. The vendor's lien note was payable to the order of petitioner and Guy P. Whitcomb and recites that the first annual installment is due on or before December 20, 1944, and that the note was given in part payment for the property "this date conveyed to the undersigned." The note contains notations on the back thereof that on January 4, 1944, January 2, 1945 and 1946, and December 19, 1946, interest was paid to January 1, 1944, 1945, 1946, and 1947, respectively. The first notation was made on January 4, 1944, by petitioner in compliance with demand made by the counsel for the purchaser. No interest was paid for the period December 20, 1943, to January 1, 1944, and counsel for the purchaser would not have delivered the instrument out of his possession until the first notation was made. The amount of interest paid on January 2, 1945, was $1,000. The petitioner received the deed *62 from Harry K. Whitcomb on January 4, 1944. Thereafter, on that date, the deed, note, and deed of trust were delivered in the office of petitioner. At that time T. M. Bruner, who was the agent of the grantors, delivered to petitioner a check for $3,336.52, representing the down payment of $5,000 after deducting therefrom his sales commission of $750, taxes paid by him on the property for the calendar year 1943, and other expenses of sale. Taxes on the property for the calendar year 1943 were not prorated between the sellers and the purchaser. In an instrument bearing the date of December 22, 1943, the grantors agreed to a division of the proceeds of the sale. Petitioner was given 55 per centum thereof, and Beulah W. Summers and other sellers each 15 per centum. Expenses of sale were to be shared in like proportions. The agreement recites that a "contract of sales agreement" had been entered into by the parties thereto with Harvey Southworth and that of the total purchase price, $15,000 represented the value of lot No. 6 and $10,000 the value of lot No. 7. The instrument was acknowledged by petitioner and Guy P. Whitcomb on December 22, 1943, by Beulah W. Summers on December 27, 1943, and *63 by Harry K. Whitcomb and his wife on December 30, 1943. Petitioners each acquired a one-tenth interest in lot No. 6, and the improvements thereon, on the death of their father intestate on August 23, 1906, a like interest on May 2, 1926, by devise from their mother, and a one-twentieth interest on July 23, 1933, by devise from their brother. Petitioner acquired lot No. 7, and the improvements thereon, on May 2, 1926, by devise from her mother. The fair market value of the interest each of the petitioners acquired in lot No. 6, on August 23, 1906, May 2, 1926, and July 23, 1933, was $1,000, $3,750 and $300, respectively. The improvement on lot No. 6 consisted of a ten room frame dwelling constructed in 1890 by joining three old houses. The residence was used as a home by the Whitcomb family and was in very bad condition in 1926. Upon the death in 1927 of petitioner's aunt, the house was given to a brother of petitioner for tearing it down. The fair market value of the improvements on May 2, 1926, was not in excess of $500. The fair market value of lot No. 7, on May 2, 1926, was $27,500. The improvement on lot No. 7 consisted of a house, which was sold in 1927 for $500. The amount *64 was reported in an income tax return of petitioner. In 1927, the owners of the real estate started to rent the property for a used car lot and at various times thereafter the lots were leased. The Buyers and Sellers Exchange was the lessee for about two years prior to 1944 at a monthly rental of $75. Rent for December 1943 was paid to petitioner on December 1, 1943, by the lessee. The owners of the lots did not receive any rent for the property after January 1, 1944. On January 12, 1944, the lessee paid rent to Harvey Southworth for January 1944. The rent received from the lots in 1943 was less than the taxes on the property. The difference in the amounts was paid by petitioner. The owners of the lot did not report rents as income because they were of the opinion that taxes on the property offset it. Each of the petitioners claimed a deduction of $1,300 in their returns for 1944 as a loss sustained on the sale of lot No. 6. In addition thereto, petitioner Addie R. Whitcomb claimed a loss of $17,500 from the sale of lot No. 7. Respondent disallowed the deductions upon the ground that the lots were sold in 1943. Opinion The first question under the issue is whether the sale was *65 completed for tax purposes in 1944, as contended by the petitioners, or in 1943, as determined by the respondent. No single factor is decisive of the question. The question must be considered in the light of the realities and as a whole. Commissioner v. Segall, 114 Fed. (2d) 706. The contract to sell, executed on November 29, 1943, provided that the sale was contingent upon the seller furnishing good title. Objections were made to the abstract of title submitted by the sellers and the defects were not completely cured by the vendors until January 4, 1944. Until then the sellers retained possession and were not in a position to enforce specific performance of the contract. The provision made in the contract to sell for proration of taxes, rent, insurance and interest to date of closing, clearly discloses intent of the parties that no rights and burdens of ownership were to pass until the sale was actually closed. Taxes on the property for 1943 were paid by the sellers and no interest was charged to the buyer on the basis of an obligation therefor incurred in that year. Rent on the lots for the month of January 1944 was collected by the buyer. The fact that the parties *66 to the transaction did not follow the letter of the contract with respect to these matters, by selecting the closing date to determine their obligations to each other, does not outweigh other factors disclosing intent that they would not regard the transaction as complete until good title could be furnished. Such proration as was made was well within the spirit of the contract. Although the deed was signed by the sellers in 1943, it was not received by the petitioner for delivery until January 4, 1944. Thus, until that date, the sellers were not in a position to present an instrument conveying title, a condition precedent to place the buyer under an obligation to deliver a vendor's lien note for the balance of the purchase price. Respondent contends that under the rational of Lucas v. North Texas Lumber Co., 281 U.S. 11, or Frost Lumber Industries, Inc. v. Commissioner, 128 Fed. (2d) 693, we should sustain his determination. We find nothing in the cases helpful to respondent. In the former case the purchaser did not agree to close the transaction or pay the purchase price, title having been previously approved, until the transfer papers were prepared. *67 Until then, a date in the next taxable year, the court said there was no "unconditional liability of vendee for the purchase price." In the latter case a deed was recorded and on the basis thereof the United States, the buyer, secured the removal of the land from state and local tax rolls. Approval of title was regarded by the court as a mere incident under the circumstances, including the fact that the Government treated the deed as an effectual conveyance even though title was not approved by the Attorney General until the next year. Here, the sellers were in no position to meet the terms of the transaction until 1944, and the purchaser did not at any time in 1943 regard the sale as complete. Under the circumstances here, we conclude that there was no completed transaction for tax purposes until 1944. Lucas v. North Texas Lumber Co., supra; Commissioner v. Segall, supra. See Commissioner v. Union Pacific R. Co., 86 Fed. (2d) 637. The parties disagree on the amount of loss or gain from the sale and whether the property was used in a trade or business of the petitioners. In their returns for 1944, each petitioner claimed a loss of $1,300 *68 on the sale of a one-fourth undivided interest in lot No. 6, and petitioner claimed a loss of $17,500 on lot No. 7. It seems that the petitioners used a basis of $5,050 for their interests for lot No. 6 and petitioner used a basis of $27,500 for lot No. 7. The amounts received by the petitioners out of the sale are not in controversy. The respondent concedes that lot No. 6 had a value of $10,000 on August 23, 1906, when each petitioner acquired a one-tenth undivided interest therein, and $6,000 on July 23, 1933, when each of them acquired an additional one-twentieth undivided interest in the property. Such concessions are in accord with the proof here. The admissions leave in dispute on the basis for the lots the fair market value thereof on May 2, 1926, when by devise of their mother each petitioner acquired an additional one-tenth undivided interest in lot No. 6, and petitioner acquired the fee to lot No. 7. Petitioners are contending for a valuation of $37,500 on lot No. 6, on May 2, 1926, and petitioner is asking for a valuation of $27,500 on lot No. 7. Respondent insists that the values were not in excess of $15,000 and $10,000, respectively. Value on the various dates of *69 acquisition is treated by the parties, rather than the time when the lots were converted to income-producing property, as the bases for computing gain or loss. Respondent made no determination of the value of the property in the computation of the deficiencies and does not explain how he arrived at the valuations asserted on brief. The uncontradicted evidence before us supports the valuations contended for by the petitioners and we have found as a fact that the values are such. Though the evidence adduced by petitioner is not as satisfactory as might be desired a material portion of it was introduced with announcement of no objection by respondent, and discrepancies were explained. In particular, the difference as to lot No. 6 between the $37,500 value in 1926 and $10,000 value in 1933 is explained by a local business boom in 1926 and the depression in 1933. With no evidence offered to overcome that of the petitioner, we accept it and the valuations set by it. The improvements on lot No. 6 were the subject of a gift in 1927 and the improvements on lot No. 7 were sold in that year for $500. The selling price was reported in an income tax return filed by the petitioner, but from *70 such meager facts we can not say that she did not recover to that extent her basis in the lot. Accordingly, under Rule 50, the bases of petitioners will be adjusted to reflect these recoveries. Petitioners ask that the losses be adjusted to reflect their share of the selling expenses of $750 for commissions paid to T. M. Bruner. The request is not contested by respondent on brief. The amount constitutes an expense of sale, for which deductions will be allowed, $412.50 in the case of petitioner and $112.50 in the case of the other petitioner. The parties differ on whether the lots constituted capital assets, as contended by the respondent, or property used in a trade or business, as contended by the petitioners. The only ground asserted by respondent for his contention is that income from the lots was not reported in returns filed by the owners. We do not regard the fact as decisive of the question. Such failure of the owner does not in any wise alter the fact that the property was converted to business purposes in 1927 and was actually under lease at various times thereafter. Accordingly, the losses were sustained in the carrying on of a trade or business of petitioners. Decisions *71 will be entered under Rule 50.